**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

GINO MARIO RECCHIA, III, individually and as owner of MASS ARMAMENT, LLC, INC.,

                Plaintiff,

                v.

MAURA HEALEY, in her official capacity as Governor of the Commonwealth of Massachusetts, and in her individual capacity,

                Defendants.

CIVIL ACTION
NO. 1:24-cv-12560-RGS

**MEMORANDUM OF LAW IN SUPPORT OF GOVERNOR MAURA HEALEY'S**
**MOTION TO DISMISS THE COMPLAINT**

Vanessa A. Arslanian, BBO No. 688099
*Assistant Attorney General*
Massachusetts Office of the Attorney General
Constitutional and Administrative Law Division
One Ashburton Place
Boston, MA  02108
(617) 963-2107
vanessa.arslanian@mass.gov

Dated: December 23, 2024

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

STATUTORY AND REGULATORY BACKGROUND............................................1

      A.     The Federal Assault Weapons and Large-Capacity Magazine Ban............ 1

      B.     Massachusetts's Restrictions on Assault Weapons and Large-
            Capacity Magazines Prior to 2024................................................................ 2

      C.     2024 Amendments to Massachusetts's Restrictions on Assault
            Weapons and Large-Capacity Magazines.................................................... 3

FACTUAL AND PROCEDURAL BACKGROUND.....................................................4

ARGUMENT .............................................................................................................4

      I.     Plaintiffs Fail to State Any Official-Capacity Claim Against the Governor
           for Prospective Relief Because They Do Not Plausibly Allege Any
           Constitutional Violations. ........................................................................... 4

           A.     Plaintiffs Fail to State a Claim for a Violation of the Dormant
                  Commerce Clause. ....................................................................... 5

           B.     Plaintiffs Fail to State a Claim for a Violation of the Second
                  Amendment................................................................................... 7

           C.     Plaintiffs Fail to State a Claim for Violation of the Equal
                  Protection Clause Under the Fifth and Fourteenth Amendments. ............ 14

      II.    Qualified Immunity Bars the Individual-Capacity Claims Against the
           Governor. ................................................................................................... 15

      III.   The Eleventh Amendment Bars Plaintiffs' State-Law Claims Against the
           Governor in Her Official Capacity. ........................................................... 18

CONCLUSION...........................................................................................................18

## INTRODUCTION

The Court should dismiss plaintiffs Gino M. Recchia, III and Mass Armament, LLC's complaint, which challenges Massachusetts's restrictions on certain semiautomatic assault weapons and large-capacity magazines, Mass. Gen. Laws ch. 140, §§ 121 and 131M, for three reasons. First, plaintiffs have not plausibly alleged official-capacity claims against the Governor for a violation of either the dormant Commerce Clause, Second Amendment, or Equal Protection Clause. Second, plaintiffs' individual-capacity claims against the Governor should be dismissed because the Governor is entitled to qualified immunity. Finally, to the extent plaintiffs purport to raise state-law claims against the Governor in her official capacity, the Eleventh Amendment bars those claims. For these reasons, the complaint should be dismissed, with prejudice. *See* Fed. R. Civ. P. 12(b), (6).

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Federal Assault Weapons and Large-Capacity Magazine Ban.

In 1994, Congress enacted the Public Safety and Recreational Firearms Use Protection Act (the "federal ban"), which prohibited certain semiautomatic assault weapons and large-capacity feeding devices (*i.e.*, magazines). Pub. L. No. 103-322, §§ 110101-106. The federal ban defined prohibited "assault weapons" in three ways: (1) through an enumerated list of firearms, including, for example, the Colt AR-15; (2) "copies or duplicates" of firearms on that list; and (3) semiautomatic rifles that were able to accept detachable magazines and were accompanied by at least two combat-style features, including, for example, a bayonet mount or a grenade launcher. Pub. L. No. 103-322, § 110102(b). The federal ban also prohibited the transfer or possession of large-capacity magazines, defined as magazines that could accept more than ten rounds of ammunition. Pub. L. No. 103-322, § 110103(a), (b).

The federal ban exempted from its prohibitions any assault weapons or large-capacity

magazines lawfully possessed when the law was enacted (September 13, 1994) (hereafter, "pre-

ban" assault weapons), a list of firearms and their copies or duplicates, and semiautomatic rifles

that could not accept a detachable magazine holding more than five rounds of ammunition.  Pub.

L. No. 103-322, §§ 110102(a), 110103(a).  The federal ban expired in 2005, and Congress has

not enacted a similar ban.  Pub. L. No. 103-322, § 110105(2); Compl. ¶ 36.

B.    **Massachusetts's Restrictions on Assault Weapons and Large-Capacity Magazines Prior to 2024.**

In 1998, Massachusetts enacted its own restrictions on assault weapons and large-

capacity magazines modeled after the federal ban.  Mass. St. 1998, ch. 180, §§ 8 and 47, codified

at Mass. Gen. Laws ch. 140, §§ 121 and 131M.  Like the federal ban, the Massachusetts statute

prohibited the sale, transfer, or possession of certain semiautomatic assault weapons and large-

capacity magazines.  *Id.* § 47.  The statute defined "Assault weapon" to have "the same meaning

as a semiautomatic assault weapon as defined" in the federal ban, *i.e.*, the federal ban's

enumerated list, copies or duplicates of firearms on that list, and semiautomatic rifles that were

able to accept detachable magazines and were accompanied by at least two combat-style

features.  *Id.* § 8.  The statute's definition of large-capacity magazines included the federal ban's

definition, *i.e.*, magazines that could accept more than ten rounds of ammunition.  *Id.*  Like the

federal ban, the statute exempted from its prohibition "pre-ban" assault weapons and magazines,

firearms on the federal ban's exemption list, and semiautomatic rifles that could not accept a

detachable magazine holding more than five rounds of ammunition.  *Id.* § 47.

In 2004, following the federal ban's expiration, Massachusetts made its restrictions on

assault weapons and large-capacity magazines permanent.  *See* Mass. St. 2004, ch. 150, §§ 1-3.

### C.    2024 Amendments to Massachusetts's Restrictions on Assault Weapons and Large-Capacity Magazines.

In July 2024, the Legislature enacted H.4885, "An Act Modernizing Firearm Laws," which Governor Healey then signed into law (the "Act").  Mass. St. 2024, ch. 135; Compl. ¶ 16.  The law went into effect on October 2, 2024.  *See* Compl. 1.

Relevant here, the Act modified the restrictions on semiautomatic assault weapons and large-capacity magazines.  Mass. St. 2024, ch. 135 §§ 16, 20-22, 71.  The Act renamed "Assault weapons" as "Assault-style firearms."  *Id.* § 16.  The Act retained the three ways of defining prohibited assault weapons – the list of enumerated weapons, their copies or duplicates, and weapons with certain combat-style features – but modified those definitions.  *See id.* § 16(e), (f).  With respect to "copies or duplicates" firearms, the new definition codified guidance issued by the Attorney General on identifying weapons that are "copies or duplicates" of the enumerated list of assault weapons.  *See id.* § 16(f).  With respect to weapons with certain combat-style features, the definition replaced two prior features with two new prohibited features, a foregrip and barrel shroud.  *See id.* § 16(a)(iii), (v).  The Act likewise retained its prohibition on large-capacity magazines that could accept ten or more rounds of ammunition.  *See id.* § 21.

The Act also modified the circumstances under which a person could continue to lawfully possess or transfer assault weapons, permitting possession and transfer of "pre-ban" assault weapons that lawfully were possessed within Massachusetts as of August 1, 2024, but prohibiting "pre-ban" assault weapons that lawfully were owned elsewhere prior to that date.  *See* Mass. St. 2024, ch. 135, § 71.  The Act allows post-ban "copy or duplicate" weapons possessed as of July 20, 2016, the date of the Attorney General's guidance.  *See id.* § 16(f).

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Gino M. Recchia, III resides in Massachusetts and is the sole owner of a firearms retailer, plaintiff Mass Armament, LLC ("Mass Armament") (together, "plaintiffs"). Compl. ¶¶ 5-6. Recchia opened Mass Armament in 2019 and derives his personal income from that business. *Id.* ¶¶ 21, 23. Mass Armament alleges that it sells "new and used firearms of many types, including many of the items banned by the Act, that is, assault-style firearms and large capacity magazines and feeding devices," as well as ammunition and firearm accessories. *Id.* ¶ 24. Plaintiffs assert that "[t]he Act has restricted the majority of purchases and sales that Mass Armament can hereon legally conduct" and that about 70% of plaintiffs' business "will be lost because of the Act." *Id.* ¶¶ 25, 27-29. The complaint does not identify what specific change in the Act, if any, has impacted Mass Armament's business. *See id.* ¶¶ 17-20, 24-33, 56, 60.

## ARGUMENT

Plaintiffs' complaint should be dismissed for three main reasons. First, plaintiffs have not plausibly alleged official-capacity claims against the Governor for violations of the dormant Commerce Clause, Second Amendment, or Equal Protection Clause. Second, plaintiffs' individual-capacity claims against the Governor should be dismissed because the Governor is entitled to qualified immunity. Finally, to the extent plaintiffs purport to raise state-law claims against the Governor in her official capacity, the Eleventh Amendment bars those claims. For these reasons, the Court should dismiss the complaint, with prejudice.

## I.    Plaintiffs Fail to State Any Official-Capacity Claim Against the Governor for Prospective Relief Because They Do Not Plausibly Allege Any Constitutional Violations.

The Court should dismiss the official-capacity claim for prospective declaratory and injunctive relief against the Governor because plaintiffs do not state plausible claims under the dormant Commerce Clause, the Second Amendment, or the Equal Protection Clause. Nothing in

the Act's challenged provisions runs afoul of the Constitution, and the official capacity-claims should be rejected.

### A.  Plaintiffs Fail to State a Claim for a Violation of the Dormant Commerce Clause.

Plaintiffs' dormant Commerce Clause claim fails because plaintiffs do not plausibly allege that Massachusetts's restrictions on assault weapons and large-capacity magazines either discriminate against, or otherwise unconstitutionally burden, interstate commerce.  Instead, the restrictions are a proper exercise of Massachusetts's authority to prohibit "'any articles which, in its judgment, fairly exercised, are prejudicial to' the interests of its citizens."  *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).

The Constitution vests Congress with the power to "regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3.  The Commerce Clause "also 'contain[s] a further, negative command,' one effectively forbidding the enforcement of 'certain state [economic regulations] even when Congress has failed to legislate on the subject.'"  *Ross*, 598 U.S. at 368 (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995)).  The "dormant" Commerce Clause prohibits state laws "driven by economic protectionism," *i.e.*, economic "discrimination."  *Ross*, 598 U.S. at 369 (quotation omitted).  Discrimination under the Commerce Clause means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter," in contrast to state laws that "regulate[] evenhandedly with only incidental effects on interstate commerce."  *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 9 (1st Cir. 2010) (quotation omitted).

A law may impermissibly discriminate facially, in purpose, or in effect against interstate commerce.  *See, e.g.*, *Cherry Hill v. Baldacci*, 505 F.3d 28, 33 (1st Cir. 2007).  But plaintiffs

make no claim that the Act discriminates.  They allege only that Congress previously regulated assault weapons and large-capacity magazines at the federal level, but no longer does; and that the Act affects Recchia's personal "business, income, and property," as well as his personal "business with other entities and persons in other states and nations."  Compl. ¶¶ 34-36, 44-45. That is not enough to state a dormant Commerce Clause claim.  Here, the Act was not motivated by discriminatory purpose.  *See All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 38-39 (1st Cir. 2005) (finding no discriminatory purpose where challenged law "plugs [a] loophole … with perfect precision"); *cf. Ocean State Tactical, LLC v. R.I.*, 95 F.4th 38, 46-47 (1st Cir. 2024) (in upholding ban on large-capacity magazines against Second Amendment challenge, reviewing record evidence that semiautomatic weapons fitted with large-capacity magazines pose specific threat with respect to mass shootings).  Nor do the Act's effects operate to the competitive benefit to Massachusetts retailers.  *See New Eng. Motor Freight, Inc. v. R.I. Tpk. & Bridge Auth.*, -- F. 4th --, 2024 WL 5001908, at *6 (1st Cir. 2024) (party challenging facially neutral law under dormant Commerce Clause "must prove that the statute has a substantial (i.e., beyond de minimis) competitive effect on nonstate interests") (citation omitted).  The Act sets a single standard within Massachusetts prohibiting the possession, sale, and transfer of certain products. This is permissible.

In the absence of any alleged discrimination, the court must uphold the Act under the dormant Commerce Clause because "the law's burdens" on interstate commerce are not "clearly excessive in relation to the putative local benefits" under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  *Ross*, 598 U.S. at 377 (citations and quotations omitted).  "Genuinely nondiscriminatory" laws like the Act fall "well outside *Pike*'s heartland." *Id.* at 379-380.  Here, plaintiffs allege no burden beyond plaintiffs' specific business interests, let alone identify any burdens on interstate commerce that clearly exceed the Act's substantial local

benefits, which include protecting Massachusetts's citizens from the "growing and real threat" of mass shootings and gun violence. *See generally* Compl.; *cf. Ocean State Tactical, LLC v. R.I.*, 95 F.4th 38, 46-47 (1st Cir. 2024) (describing purpose of State ban on large-capacity magazines). Further, plaintiffs do not even identify *how* the Act burdens their business, making only a conclusory statement that it does. *See generally* Compl.  Where plaintiffs allege no harm beyond their own interests, and where "substantial harm" to the interstate market is "nothing more than a speculative possibility," no dormant Commerce Clause claim arises. *See Ross*, at 385-86, 387 (plurality op.) (citing *Exxon Corp. v. Gov. of Md.*, 437 U.S. 117, 127 (1977)).  Plaintiffs thus fail to state a violation of the dormant Commerce Clause.

**B.    Plaintiffs Fail to State a Claim for a Violation of the Second Amendment.**

Plaintiffs also fail to state a claim for a violation of the Second Amendment based on the Act's changes to Massachusetts's longstanding restrictions on certain semiautomatic assault weapons and large-capacity magazines, for two reasons.  First, plaintiffs fail to show that "the Second Amendment's plain text covers" plaintiffs' freestanding interest in selling assault weapons or large-capacity magazines, wholly divorced from the ability of any customer to acquire them.  Second, even if the Second Amendment covers that conduct, Massachusetts's restrictions nevertheless are "consistent with the principles that underpin our regulatory tradition." *See United States v. Rahimi*, 602 U.S. 680, 692 (2024) (citing *N.Y State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 26-31 (2022)).

**1.    The Second Amendment Framework.**

The Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Rahimi*, 602 U.S. at 691 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)).  The Supreme Court in *Bruen* and *Rahimi* prescribed a two-step analysis to evaluate whether a firearm restriction is consistent with the

Second Amendment. Under that approach, a plaintiff must first demonstrate that "the Second Amendment's plain text covers" the conduct at issue. *See Bruen*, 597 U.S. at 17, 24, 32; *see also Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) ("ordinary default rule" is that "plaintiffs bear the risk of failing to prove their claims"). If it does, the government must show that the "challenged restriction is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 26-31). *Bruen* and *Rahimi* direct courts to examine whether the modern regulation is "relevantly similar" to historical regulations by comparing "how" and "why" the respective regulations burden protected conduct. *Rahimi*, 602 U.S. at 692; *Bruen*, 597 U.S. at 28-29. This analogical inquiry does not require a "historical twin," or a "dead ringer for historical precursors." *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 30). Instead, a regulation will be "analogous enough to pass constitutional muster" if it "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 602 U.S. at 692. Here, the complaint fails on both parts of the *Bruen* analysis.

### 2. The Second Amendment's Plain Text Does Not Cover Plaintiffs' Interest in Selling Assault Weapons and Large-Capacity Magazines.

The Second Amendment's "plain text" does not cover plaintiffs' interest in selling assault weapons and large-capacity magazines. Plaintiffs purport to vindicate businesses' ability to sell assault weapons, rather than any individual right to firearm possession. *See* Compl. ¶¶ 5-6, 14-15, 21-33, 44-45, 57-62. While the Second Amendment protects "ancillary rights necessary to the realization of the core right to possess a firearm for self-defense," it "does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677, 682-83 (9th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 597 U.S. at 17; *accord United States v. Chafin*, 423 Fed. App'x 342, 344 (4th Cir. 2011) (no authority

suggesting "that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm"), *abrogated on other grounds by Bruen*, 597 U.S. at 17. As the Supreme Court explained in *Heller*, the Second Amendment guarantees an "*individual right to possess and carry weapons in case of confrontation.*" 554 U.S. at 592 (emphasis added); *see also id.* at 635 (the Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home"). The right of citizens "to acquire firearms legally is not coextensive with the right of a particular proprietor to sell them." *Teixeira*, 873 F.3d at 682.

Nowhere does *Heller*, *Bruen*, or *Rahimi* suggest that the Second Amendment guarantees retailers a right to *sell* weapons, wholly divorced from the interest of their customers in obtaining them. *Cf. Teixeira,* 873 F.3d at 682. To the contrary, the Supreme Court has maintained that laws imposing "conditions and qualifications on the commercial sale of arms" are "presumptively lawful." *Heller*, at 626-27 & n. 26; *McDonald*, 561 U.S. at 786 (repeating *Heller*'s "assurances" that commercial sales regulations are presumptively lawful); *Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring) (quoting with approval *Heller*'s and *McDonald*'s assurances). There is likewise no historical basis upon which to suggest that the Second Amendment protects an individual right to "engage in firearms commerce" "or *sell* a firearm unconnected to the rights of citizens to 'keep and bear' arms." *See Teixeira*, 873 F.3d at 683-88 (emphasis in original) (conducting exhaustive textual and historical analysis of the Second Amendment to evaluate whether it encompassed plaintiffs' right to sell firearms).

Nor are *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) or *Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011), which plaintiffs cite in the complaint, to the contrary. Compl. ¶¶ 14-15. In *Marzzarella*, the court commented only in passing that commercial sales regulations are likely not categorically exempted from Second Amendment analysis, otherwise "there would be no constitutional defect in prohibiting the commercial sale of firearms." 614 F.3d at 92 n.8. In

*Ezell*, the court addressed whether live firing-range training was "categorically unprotected" by the Second Amendment, not whether the firing-range business itself had a standalone right under the Second Amendment to operate a range. *See Ezell*, 651 F.3d at 704-705, 709.  Thus, plaintiffs' interest in selling certain assault weapons and large-capacity magazines does not fall within the Second Amendment's plain text, and the Second Amendment claim fails on that basis alone. *See Texeira*, 873 F.3d at 682.

### 3.    *Ocean State* **Forecloses Plaintiffs' Second Amendment Claim as to Large-Capacity Magazines.**

Even if the Second Amendment's text covers plaintiffs' conduct, the First Circuit's recent *Ocean State* decision forecloses their claim with respect to large-capacity magazines.  *See Ocean State Tactical, LLC v. R.I.*, 95 F.4th 38 (1st Cir. 2024).  There, the First Circuit affirmed the denial of a motion to preliminarily enjoin Rhode Island's large-capacity magazine restrictions, which are materially identical in substance to the Act.  *See id.* at 41; *compare* 2024 Mass. St. ch. 135, § 21.  Applying *Bruen*,[1] the court concluded that Rhode Island's restrictions on large-capacity magazines were consistent with our Nation's history and tradition of firearm regulation because they were relevantly similar to historic regulations.  *Id.* at 46, 52.  The First Circuit's conclusion in *Ocean State* directs the same result here under the second part of the *Bruen* test. Moreover, the *Ocean State* decision is consistent with that of three other Circuit Courts of Appeals and District Courts across the country that, applying *Bruen*, either have upheld the constitutionality of restrictions on assault weapons, large-capacity magazines, or both, or have denied preliminary injunctive relief based on the likely constitutionality of those restrictions. *See, e.g.*, *Hanson v. District of Columbia*, 120 F.4th 223, 230, 240, 242-43 (D.C. Cir. Oct. 29,

---

[1] The First Circuit assumed, without deciding, that large-capacity magazines are "arms" covered by the Second Amendment's plain text.  *Id.* at 43.

2024) (affirming denial of motion to preliminarily enjoin D.C.'s restriction on large-capacity magazines capable of holding more than ten rounds of ammunition, including because law likely was consistent with tradition of firearms regulation); *Bianchi v. Brown*, 111 F.4th 438, 462 (4th Cir. 2024) (en banc) (upholding Maryland's restrictions on assault weapons as consistent with tradition of firearms regulation); *Bevis v. Naperville*, 85 F.4th 1175, 1198-1202 (7th Cir. 2023), *cert. denied sub. nom. Harrel v. Raoul*, 144 S. Ct. 2491 (July 2, 2024) (affirming denial of motion to preliminarily enjoin Illinois's assault weapons and large-capacity magazine restrictions, including because restrictions were consistent with history and tradition of firearms regulation); *Capen v. Campbell*, 708 F. Supp. 3d 65, 87, 92 (D. Mass. Dec. 21, 2023) (Saylor, C.J.), *appeal pending*, 1st Cir. No. 24-1061 (argued Oct. 7, 2024) (denying motion to preliminarily enjoin Massachusetts's restrictions on assault weapons and large-capacity magazines prior to passage of the 2024 Act).[2]

Applying *Ocean State*'s *Bruen* analysis to Massachusetts's materially identical law directs the same conclusion here. As the First Circuit reasoned with respect to "how" the

---

[2] Other District Courts applying *Bruen* have reached similar conclusions with respect to restrictions on either assault weapons, large-capacity magazines, or both. *See, e.g.*, *Banta v. Ferguson*, No. 2:23-CV-00112-MKD, 2024 WL 4314788, at *9-*11 (E.D. Wash. Sept. 26, 2024) (denying motion to preliminarily enjoin Washington's assault weapons prohibition, including because second *Bruen* step likely was satisfied); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham*, --- F. Supp. 3d ---, No. 2:23-cv-710, 2024 WL 3466482, at *1, *22 (D. Vt. July 18, 2024) (denying motion to preliminarily enjoin Vermont's large-capacity magazine restrictions, concluding restriction likely met *Bruen*'s second step) *appeal pending*, No. 24-2026 (2nd Cir July 31, 2024); *Rupp v. Bonta*, 723 F. Supp. 3d 837, 882 (C.D. Cal. Mar. 15, 2024) (granting summary judgment to California with respect to assault weapons restrictions), *appeal pending*, No. 24-2583 (9th Cir. Apr. 24, 2024); *Oregon Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 874, 911 (D. Or. July 14, 2023) (following bench trial, upholding Oregon's large-capacity magazine ban, including because *Bruen*'s second step met), *appeal pending*, No. 23-35479(9th Cir. July 17, 2023); *Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 103 (D. Conn. Aug. 3, 2023) (denying motion to preliminarily enjoin Connecticut's ban on assault weapons and large-capacity magazines, including because *Bruen*'s second step likely was met), *appeal pending*, No. 23-1162 (2nd Cir. Aug. 16, 2023).

restriction burdens protected conduct, a ban on large-capacity magazines imposes "no meaningful burden" on the right of self-defense, because civilian self-defense "rarely – if ever – calls for the rapid and uninterrupted discharge of many shots, much less more than ten," and is comparable to burdens imposed by historical regulations.  *See id.* at 45; *see also Bianchi*, 111 F.4th at 471-72; *Campbell*, 708 F. Supp. 3d. at 91-92.  Further, with respect to "why" the restriction burdens protected conduct, Massachusetts passed the Act for the same reasons as Rhode Island: to "respond to threats to public safety, particularly mass shootings." *Capen*, 708 F. Supp. 3d at 91; *Ocean State*, 95 F. 4th at 44; *Bianchi*, 111 F.4th at 441, 463-64.  Accordingly, large-capacity magazines likely are "well within the realm of devices that have historically been prohibited once their danger became manifest," *Ocean State*, 95 F.4th at 49-50, and Massachusetts's restrictions on them are consistent with the principles underpinning our Nation's tradition of firearms regulation.

### 4.    *Ocean State* **and Other Federal Case Law Strongly Supports a Conclusion that the Act's Restrictions on Assault Weapons Are Consistent with History and Tradition.**

As a threshold matter, plaintiffs fail to demonstrate that the Second Amendment's plain text covers assault weapons.  *See Bruen*, 597 U.S. at 32.  Whether the Second Amendment's text protects assault weapons requires an assessment of whether they are "bearable arms" "in common use" for self-defense.  *See Bruen* 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627).  Here, Plaintiffs fail to allege facts supporting a conclusion that assault weapons are "arms" protected by the Second Amendment.[3]

---

[3] Regardless, assault weapons are not "arms" within the meaning of the Second Amendment. *See, e.g. Bianchi*, 111 F.4th at 461 (holding that the Colt AR-15, the "paradigmatic" semiautomatic assault rifle, is not an "Arm[]" within the Second Amendment's text).

Even assuming assault weapons are "arms" protected by the Second Amendment, the Act's restrictions nevertheless comport with "the principles that underpin our [Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692 (citing *Bruen*, 597 U.S. at 26-31). As explained above, every Circuit Court of Appeals to have addressed the question, as well as a court in this District (and several District Courts elsewhere) are in accord that restrictions on assault weapons satisfy *Bruen*'s second step because they are like the historical regulations that responded to newly adopted, and unusually dangerous, weapons posing a distinct threat to public safety. *See, e.g.*, *Bianchi*, 111 F.4th at 462; *Bevis*, 85 F.4th at 1200-1201; *Hanson*, 120 F.4th at 237-242 (evaluating historical analogues to the District of Columbia's large-capacity magazine restrictions); *Ocean State*, 95 F.4th at 44-46, 47-48 (same, with respect to evaluating Rhode Island's large-capacity magazine restrictions); *Capen*, 708 F. Supp. 3d at 87, 92 (historical record demonstrates Massachusetts's restrictions on assault weapons and large-capacity magazines "comports with the nation's historical tradition of weapons regulation").

Like Massachusetts's restrictions before the Act, and like the restrictions evaluated in other Circuits, the Act's current restrictions on assault weapons impose a similar burden on the right of armed self-defense, and are similarly justified, as other historical regulations that restricted access to "dangerous and unusual" weapons. *See Capen*, 708 F. Supp. 3d at 84-85. With respect to how the Act burdens the right of self-defense, the Act's burden is at most negligible, because assault weapons are neither suitable for nor actually used for self-defense. *See, e.g.*, *Bianchi*, 111 F.4th at 472 (such weapons "are ill-suited for and disproportionate to the objective of self-defense"); *Capen*, 708 F. Supp. 3d at 84-85; *Ocean State*, 95 F.4th at 49. With respect to why the Act burdens the right to self-defense, the Act is similar to historical analogues because it "respond[s] to the most urgent and visible threats" of the time, "while nonetheless protecting the core right" of "citizens to defend themselves with arms in pressing

13

circumstances." *Bianchi*, 111 F.4th at 464; *id.* at 466-67 & nn.5-10 (canvassing historical restrictions on "excessively dangerous weapons such as Bowie knives, dirks, sword canes, metal knuckles, slungshots, and sand clubs"); *see Bevis*, 85 F.4th at 1198, 1201-1202; *Ocean State*, 95 F.4th at 46-48 (discussing restrictions on certain weapons "once their popularity in the hands of murderers became apparent."); *see also supra* pp. 11, n.2 (collecting District Court cases).

Here, plaintiffs identify no constitutionally significant difference between the assault weapons restrictions as they existed before the Act and their current version. Thus, if this Court reaches the merits of plaintiffs' Second Amendment claim, it should conclude, consistent with the decisions of the District Court in *Capen*, the First Circuit in *Ocean State*, and of other federal courts, that the assault weapons restrictions are consistent with the principles underpinning our Nation's regulatory tradition and that plaintiffs fail to state a Second Amendment claim. *See Bianchi*, 111 F.4th at 462; *Capen*, 708 F. Supp. 3d at 87, 92; *Ocean State*, 95 F.4th at 46, 52.

### C.   Plaintiffs Fail to State a Claim for Violation of the Equal Protection Clause Under the Fifth and Fourteenth Amendments.

Plaintiffs also fail to state a claim for violation of the Equal Protection Clause. Because the right to keep and bear arms for self-defense is an enumerated Constitutional right, "it is more appropriately analyzed under the Second Amendment than the Equal Protection Clause." *See Teixeira v. County of Alameda*, 822 F.3d 1047, 1052 (9th Cir. 2016) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of  'substantive due process,' must be the guide for analyzing these claims") (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)), *overruled on other grounds*, *Teixeira v. County of Alameda*, 873 F.3d 670, 682 n.7 (9th Cir. 2017) (en banc) (affirming dismissal of Equal Protection Clause claims)). Here, because plaintiffs' "equal protection challenge is 'no more than a [Second] Amendment

claim dressed in equal protection clothing,' it is 'subsumed by, and coextensive with,' the former and therefore not cognizable under the Equal Protection Clause." *See Teixeira*, 822 F.3d at 1052 (quoting *Orin v. Barclay*, 272 F.3d 1207, 1213 n.3 (9th Cir. 2001)). Accordingly, this claim should be dismissed.

## II.    Qualified Immunity Bars the Individual-Capacity Claims Against the Governor.

The Court should dismiss the individual-capacity claims against the Governor[4] because the Governor is entitled to qualified immunity. Plaintiffs fail to allege any conduct by the Governor that constitutes a "violation of a constitutional right," let alone a right that was "clearly established at the time of the defendant's alleged violation." *Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 517 (1st Cir. 2016) (quotation omitted)

Plaintiffs make virtually no allegations personal to the Governor, much less allegations amounting to violations of constitutional rights. They allege only that she signed the Act into law,[5] is generally responsible for enforcing it, and has "authority to change or modify" it to

---

[4] Plaintiffs do not identify whether they seek damages from the Governor in her official or individual capacity, or both. *See* Compl. at 10; Request for Relief (c). To the extent they seek damages against the Governor in her official capacity, the Eleventh Amendment bars any recovery. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989) ("a State is not a person within the meaning of [Section] 1983"); *Doucette v. Ives*, 947 F.2d 21, 29 (1st Cir. 1991) ("the Eleventh Amendment bars the award by a federal court of retroactive relief in the form of money damages payable from the state treasury") (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). Accordingly, the Court should dismiss any official-capacity damages claim.

[5] To the extent plaintiffs premise their claims on the fact that the Governor signed the bill into law, she is absolutely immune from suit on that basis. *Bogan v. Scott-Harris*, 523 U.S. 44, 54–55 (1998). Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity." *Id.*, 523 U.S. at 54–55 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). Though the Governor is not a legislator, "officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions," and signing a bill into law is an "integral step[] in the legislative process." *Id.*, 523 U.S. at 55 (citing *Smiley v. Holm*, 285 U.S. 355, 372-373 (1932) (recognizing Governor's signing of bill as part of legislative process)).

"alleviate" their injuries.  Compl. 1, ¶¶ 7, 16.  These allegations are insufficient to defeat the Governor's qualified immunity, for two reasons.

First, plaintiffs fail to allege facts plausibly establishing a violation of any constitutional right.  Claims against a government official alleging a violation of rights under Section 1983 must allege that the "Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2008); *id.* at 677 ("each Government official, his or her title notwithstanding, is only liable for his or her own misconduct").  Section 1983 requires a "'strong causal connection" between the defendant's conduct and the alleged deprivation.  *See Ramírez-Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014) ("After *Iqbal*, as before, we have stressed the importance of showing a strong causal connection between the supervisor's conduct and the constitutional violation"); *see also Johnson v. City of Worcester*, No. 17-40103-TSH, 2020 WL 1140077, at *7 (D. Mass. Mar. 9, 2020) (Section 1983 "requires a plaintiff to show a causal connection or affirmative link between a defendant and the federal right of which the plaintiff was deprived").

Here, plaintiffs allege no direct involvement by the Governor in the complained-of violations.  Plaintiffs cannot hold the Governor liable simply because she is the head of the Executive Branch.  *See Iqbal*, 556 U.S. at 676 (vicarious liability inapplicable to Section 1983 suits).  Because plaintiffs fail to allege any facts suggesting that the Governor was involved personally in any violation, the Court should dismiss the individual-capacity claims against her, either for failure to state a claim or under the first prong of the qualified immunity analysis.  *See, e.g.*, *Bruyette v. Patrick*, No. 13-12727-DJC, 2013 WL 6708998, at *2 (D. Mass. Dec. 16, 2013) ("Bruyette's complaint fails to set forth any legal or factual bases for including Governor Patrick [ . . .] as a defendant[].  There are no allegations of any direct involvement in the parole revocation proceedings; indeed, there are no allegations at all."); *see also Montgomery v. Rufo*,

No. 6-12419-GAO, 1998 WL 151234, at *1 (D. Mass. Mar. 27, 1998) (dismissing individual-capacity claims against Governor Weld absent "facts which would tend to show that Weld was involved personally with any civil rights violations or violations of other legal rights or duties").

Second, plaintiffs fail to allege that any of their rights were clearly established at the time of the alleged violation. "A right is 'clearly established' if 'the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional.'" *Guadalupe-Báez*, 819 F.3d at 517 (quoting *Maldonado v. Fontanes,* 568 F.3d 263, 269 (1st. Cir. 2009)). With respect to the Second Amendment, plaintiffs' alleged right to sell assault weapons and large-capacity magazines was in no way "clearly established" so as to permit the imposition of money damages on the Governor. The First Circuit upheld Massachusetts's restrictions against a Second Amendment challenge before the Supreme Court's decision in *Bruen*. *Worman v. Healey*, 922 F.3d 26, 39, 41 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 597 U.S. at 17. After *Bruen*, a District Court in this District upheld similar restrictions (before the 2024 Act amended them) at the preliminary injunction stage in *Capen v. Campbell*, 708 F. Supp. 3d 65, 87, 92 (D. Mass. Dec. 21, 2023) (Saylor, J.), *appeal pending*, First Cir. No. 24-1061 (argued Oct. 7, 2024). Moreover, as described above, the First Circuit, as well as the Courts of Appeals for the Fourth, Seventh, and District of Columbia Circuits, and District Courts across the country, either have upheld the constitutionality of restrictions on assault weapons and large-capacity magazines, or denied preliminary injunctive relief based on the likely constitutionality of these restrictions. Nor do the complaint's allegations implicate any "clearly established" rights under the dormant Commerce Clause or Equal Protection Clause. *See supra* pp. 5-7, 14-15. Accordingly, the Governor is entitled to qualified immunity for her conduct. *See Guadalupe-Báez*, 819 F.3d at 517.

**III.    The Eleventh Amendment Bars Plaintiffs' State-Law Claims Against the Governor in Her Official Capacity.**

To the extent plaintiffs purport to raise claims for violation of the Massachusetts Constitution against the Governor in her official capacity, the Eleventh Amendment compels their dismissal.  *See* Compl. ¶ 48 (invoking Massachusetts's right to bear arms); ¶ 53 (invoking Massachusetts's Due Process Clause).  The exception to Eleventh Amendment immunity set forth in *Ex Parte Young* has no application to state-law claims because a federal court may not "instruct[] state officials on how to conform their conduct to state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106, 121 (1984).  Accordingly, to the extent the Court construes plaintiffs' complaint as raising state-law claims against the Governor in her official capacity, the Eleventh Amendment bars those claims and the Court should dismiss them.

## CONCLUSION

For the reasons described above, the Governor respectfully requests that the Court dismiss the complaint, with prejudice.

Respectfully submitted,

MAURA HEALEY, in her official capacity as
Governor of the Commonwealth of Massachusetts,
and in her individual capacity,

By her attorneys,

*/s/ Vanessa A. Arslanian*
Vanessa A. Arslanian, BBO No. 688099
Assistant Attorney General
Massachusetts Office of the Attorney General
Constitutional and Administrative Law Division
One Ashburton Place
Boston, MA  02108
(617) 963-2107
vanessa.arslanian@mass.gov

Dated: December 23, 2024

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants.

/s/ *Vanessa A. Arslanian*
Vanessa A. Arslanian
Assistant Attorney General

Dated:  December 23, 2024