## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

GINO MARIO RECCHIA, III, individually
and as owner of MASS ARMAMENT, LLC,
INC.,

      Plaintiffs,

v.

                                Civil No.: 1:24-cv-12560-RGS

MAURA HEALEY, in her Official Capacity
as Governor of the Commonwealth of
Massachusetts and in her Individual Capacity,

      Defendants.

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

NOW COMES, the Plaintiffs, who respectfully oppose the Defendant's

Motion to Dismiss the Complaint made pursuant to Rule 12(b) of the Federal Rules of

Civil Procedure. In support of this Opposition, Plaintiffs submit the following:

When deciding a motion to dismiss under Rule 12(b)(6), a court must

"construe all factual allegations in the light most favorable to the non-moving party to

determine if there exists a plausible claim upon which relief may be granted."

*Tomasella v. Nestle USA, Inc.,* 962 F.3d 60, 70 (1st Cir. 2020).

"A judge must accept as true all of the factual allegations contained in the

complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

The Court's function on a motion to dismiss is "not to weigh the evidence that

might be presented at a trial but merely to determine whether the complaint itself is

legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

"A complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ibid." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Furthermore, Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99 *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"As a general rule, a court freely grants leave to amend a complaint that has been dismissed. Fed. R. Civ. P. 15(a); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986)." *Forbes v. Cnty. of San Diego*, Case No. 20-cv-00998-BAS-JLB, 4 (S.D. Cal. Mar. 4, 2021)

## Second Amendment and Constitutional Background

Article 1 of the Constitution of the Commonwealth of Massachusetts states that "all people are born free and equal and have certain natural, essential and unalienable rights; among which may be reckoned the right of enjoying and defending their lives and liberties; that of acquiring, possessing and protecting property; in fine, that of seeking and obtaining their safety and happiness." Mass. Const. art. I.

The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

The Fourteenth Amendment to the United States Constitution provides in pertinent part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Second Amendment is fully applicable to the States through the Fourteenth Amendment's Due Process and Privileges or Immunities Clauses. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010); *id*. at 805 (Thomas, J., concurring).

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). And it "elevates above all other interests"—including the Commonwealth's claimed public safety and general welfare interests purportedly contained in the Handgun Ban "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id* at 635.

"The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Heller*, 554 U.S. at 634 (emphasis original).

"Just as the First Amendment protects modern forms of communications, … and the Fourth Amendment applies to modern forms of search, … the Second Amendment extends, prima facie, to all instruments that constitute bearable

arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (internal citations omitted); *accord Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring). Thus, this protection extends to all firearms currently in common use that are not both "dangerous per se" and "unusual." *Caetano* at 417 ("A weapon may not be banned unless it is both dangerous *and* unusual.") (italics added).

"Dangerous *per se*" does not include the mere inherent propensity of a firearm to cause injury. *Caetano*, 577 U.S. at 418 ("firearms cannot be categorically prohibited just because they are dangerous" in the general sense of the term). Indeed, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.* "*Heller* defined the 'Arms' *covered by* the Second Amendment to include "anything that a man wears for his defense, or takes into his hands, or useth in wrath to cast at or strike another."" *Id.* (quoting *Heller*, 554 U.S. at 581) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)) (italics original in *Caetano*). And an arm is not "unusual" so as to fall outside the ambit of this protection so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id.* at 420 (italics original).

"[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment[.]" *United States v. Marzzarella*, 614 F.3d 85, 92, n. 8 (3d Cir. 2010). Indeed, "prohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *Id.*

4

Thus, law-abiding citizens in Massachusetts have a fundamental constitutional right to keep and bear arms, including but not limited to, buying, selling, transferring, transporting, carrying, and practicing safety and proficiency with, firearms—*Heller*, 554 U.S. at 628— as well as ammunition, magazines, and appurtenances, under the Second and Fourteenth Amendments.

This right extends to *all* firearms in common use for self-defense and other lawful purposes. *Caetano*, 577 U.S. at 420. So, the fundamental, individual right to keep and bear firearms in Massachusetts and the rest of the country includes the right to acquire common, modern handguns in common use for self-defense and other lawful purposes—indeed, arms that are lawfully sold and possessed throughout the United States.

The United States Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 142 S.Ct. 2022) unanimously held that what is imperative in Second Amendment analysis is that court decisions must be based on what the understanding was of gun rights when the Second Amendment was passed. That is, what was the understanding in 1791 of the rights of the people to possess firearms and what restrictions were understood about those rights. Moreover, in *Bruen*, the Supreme Court overruled all the Circuits' practices of making a "means-end scrutiny" test in a case once it was found that a claimant had made a showing that they had a Second Amendment right to possess a firearm. In effect, the *Bruen* Court held that there is no scrutiny at all once it is found that a claimant has a Second Amendment right to possess a

firearm irrespective of any perceived Government interest. The *Heller* Court wrote that "By the time of the founding, the right to have arms had become fundamental for English subjects" 554 U.S. at 593. The right to bear arms was a "pre-existing right" when the Second Amendment was codified and therefore the history of bearing arms must be considered when analyzing the Second Amendment. Id. 592 (emphasis in original). "Constitutional rights are enshrined within the *Heller* line of reasoning. In keeping with *Heller*, we hold that when the Second Amendments plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. 142 S.Ct., pp. 2125-26. (cites omitted). The Court went on to say that *Heller* does not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." Id.

The Court explained that "reliance on history to inform the meaning of constitutional text—especially text meant to codify a pre-existing right—is, in our view, more legitimate, and more administrable, than asking judges to 'make difficult empirical judgments' about 'the costs and benefits of firearms restrictions,' especially given their 'lack [of] expertise in the field. Id. (cites omitted). Thus, "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar

6

historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." Id.

## Preliminary Statement

The crux of the Complaint in this action centers around Massachusetts legislation enacted under H-4885, "An Act Modernizing Firearm Law". *See, e.g., Complaint, Preliminary Statement*. This action is not per se against Governor Healy. In that respect, the Defendant signed the Act into law and has the responsibility of enforcing said Act. Moreover, the Defendant also made a further order that, in effect, interfered with the constituency's right to put the repealing of the Act onto the ballot. Counsel therefore named Governor Healy as the defendant, since it's the Governor's power to enforce the unconstitutional law that is part of this action, not just the actual enactment of the law. However, should the Court be of the opinion that the Governor is not a proper party to this action, then Plaintiffs submit that he ought to be allowed to amend the caption naming the Commonwealth of Massachusetts as the Defendant and/or that the Court should do so by Order.

## Salient Background

Defendant signed into law in July, 2024 an Act (hereinafter, "Act") that, *inter alia,* newly regulated certain firearms and feeding devices used in those firearms. *Complaint*, §§16-17. Plaintiff Gino Mario Recchia, III (hereinafter, "Recchia") owns, operates, and earns his living in Plaintiff Mass Armament, LLC, Inc., (hereinafter, "Mass Armament") as does at least two other employees. *Id*. 5, 22-23. Mass Armament deals mostly with the firearms now banned by the Act at issue herein. *Id*. 24. The majority of firearms Plaintiffs deal in are imported into Massachusetts. *Id*. 26.

The Act has affected Plaintiffs' main business, estimated to be about a 70% loss. *Id.* 28-30. Although the United States once banned the sale of most of the firearms listed in the Act, the United States lifted the ban and allows the sale of said firearms. *Id.* 34-36.

Plaintiffs alleges in the instant Complaint that the Act violates the Constitution's Commerce Clause (Count I), Plaintiffs' Second Amendment rights to keep and bear arms (Count II), and their Equal Protection rights in that other United States citizens can possess the Act's banned firearms and their right to engage in a lawful occupation (Count III). Plaintiffs seek declaratory and injunctive relief, nominal damages and fee reimbursement.

The Defendant has filed a Motion to Dismiss the Complaint pursuant to Rule 12(b) of the Rules of Civil Procedure. In said Motion, three (3) grounds have been raised:

> First, plaintiffs have not plausibly alleged official-capacity claims against the Governor for a violation of either the dormant Commerce Clause, Second Amendment, or Equal Protection Clause to the U.S. Constitution. Second, plaintiffs' individual-capacity claims against the Governor should be dismissed because the Governor is entitled to qualified immunity. Finally, to the extent plaintiffs purport to raise state-law claims against the Governor in her official capacity, the Eleventh Amendment bars those claims.

*Defendant's Motion to Dismiss*, p. 1. Defendant has submitted a Memorandum of Law (hereinafter, "Memo") in support of their Motion. Plaintiffs will address Defendant's arguments seriatim. However, Plaintiffs again note that the issue in this case centers around the Act and the Defendant's signature endorsing it and the power to enforce it. No real damages are actually sought in this suit. What is primarily being

asked is relief from the Act's enforcement and a declaration that the Act is unconstitutional.

<b><u>Argument</u></b>

### 1.    <u>Commerce.</u>

As this Court aptly and tersely stated it, "To survive a motion to dismiss under Rule 12(b)(6), a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *StandWithUs Center for Legal Justice v. Massachusetts Institute of Technology*, ___ F.Supp.3d ___ (D.Mass. 2024) (cites omitted).

Consequently, it is true for the purposes of Defendant's Motion to Dismiss the Complaint that the Complaint alleges that Recchia and Mass Armament have been, and will be, devastated by enforcement of the Act. Recchia may be forced to go out of business because of the Act. Moreover, the Court would not be amiss in believing, at least for purposes of the instant motion before discovery, that it can be shown that the Act will have a detrimental effect on all stores in Massachusetts that sell the types of arms named in the Act, and that the Act will also impact the sales of said arms by private individuals, either intra- or interstate. In that respect, Plaintiffs assert that at the proper time they can present sufficient statistics demonstrating the impact on commerce in the Commonwealth of the Act's implementation and enforcement.

The Plaintiffs entire business concerns arms and their paraphernalia that originate from out-of-state and travel through interstate commerce. Thus, most of Plaintiffs' business concerns interstate commerce.

Defendant mainly relies on two (2) leading Supreme Court cases in defense of the Act not violating the Dormant Commerce Clause: *National Pork Producers Council, et al. v. Ross*, 598 U.S. 356 (2023) and *Pike v. Bruce Church, Inc*. 397 U.S. 137 (1970).

*Ross*, the most recent Dormant Commerce Clause case, was a most fractured decision, which Plaintiffs suggest was without a clear consensus. In fact, there were five (5) separate opinions, and the majority decision was by plurality vote. Defendant relies on *Ross* primarily because the Supreme Court has stated that for Dormant Commerce Clause purposes a state law must "discriminate" in order for it to run afoul of the Federal Commerce Clause power. Defendant claims the Act does not discriminate against commerce.

*Ross* concerned a California law that restricted sale of pork products where the pigs had been raised in what was considered inhumane conditions. The plurality decision stated that the Court's Dormant Commerce Clause jurisprudence required an action to show that the controversial law discriminated against out-of-state economic interests. It appears that most, if not all, of the Justices agreed with the discriminatory nature of the Court's jurisprudence.

To begin, *Ross* is not well-suited to use as precedent for the issues involved in this case. Unlike in this case, in *Ross* there was no claim being made by the Plaintiffs that the law discriminated against out-of-state interests. *Id*. 364. Unlike here, no constitutional rights were involved. "While the Constitution addresses many weighty issues, the type of pork chops California merchants may sell is not on that list". *Id.*

10

*Also see, id.* 368 (Congress has not enacted any law contrary to California's pork product restrictions).

Plaintiffs respectfully submit that violations of the Second Amendment to the United States Constitution are not analogous to a pork chop case. Constitutional rights are intricately involved. Under prevailing law, as argued below, Plaintiffs have a constitutional right to possess the arms banned by the Act, whereas in *Ross* the plaintiffs had no constitutional right to possess certain types of pork products. Had a constitutional right to consume pork been involved in *Ross*, it is obvious that the case would have been decided differently.

Second, Defendant claims that the Act does not "discriminate against, or otherwise burden, interstate commerce." *Memo* at 5. This is an astonishing statement. The Act discriminates against all manufacturers of the popular banned weapons and forbids their sale or possession in the Commonwealth, albeit such is not the case in other States, while not discriminating against manufacturers or sellers of, e.g., simple revolvers. The Act discriminates against millions of Massachusetts residents who might wish to possess the banned weapons. The Act favors manufacturers of some weapons over the manufacturers of the banned weapons, thus discriminating against the latter. This violates the principles encompassed under the Commerce Clause. "Our system, fostered by the Commerce Clause, is that every farmer and every craftsman shall be encouraged to produce by the certainty that he will have free access to every market in the Nation, that no home embargoes will withhold his exports, and no foreign state will by customs duties or regulations exclude them." *H.P. Hood & Sons, Inc. v. De Mond*, 336 U.S. 525, 539 (1949). Plaintiffs contend that

what Defendant is doing in this case violates that principle. They are controlling interstate commerce and usurping the sole prerogative of the United States Congress. This is even more evident here because Congress specifically lifted the former firearms ban on the analogous firearms in question and thus authorized citizens the right to possess the weapons banned by the Act. What Congress allowed; the Defendant cannot subsequently disallow without violating the Supremacy Clause of the United States Constitution.

Ironically, had Defendant banned *all* firearms in the Commonwealth they arguably may have been able to make out a stronger case, however, banning some firearms and not all others amounts to *discrimination* against the banned weapons. Defendant is favoring one manufacturer over another and interfering in the interstate commerce of the United States. Therefore, the Plaintiff submits that the discriminatory aspect of the Commerce Clause jurisprudence is met in this case.

The *Pike* principle, also discussed *passim* in *Ross*, is "Where [a] statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." 397 U.S. at 142. Even then, if "a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id*.

Defendant has not clearly identified a "legitimate local public interest" requiring enforcement of the Act or its constitutionality in contravention of the

12

Commerce Clause. The best Defendant can do is refer to the decision in *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46-47 (1st Cir. 2024), a case upholding the denial of a preliminary injunction relative to large capacity magazines, where the panel cited to testimony concerning the reloading of weapons in prior mass shooting incidents. However, Defendant has failed to tie a legitimate "local" public interest *in Massachusetts* to the enactment and enforcement of the Act but instead have referred to a few criminal acts in other states. Moreover, *Ocean State* concerns only large capacity magazines and injunctions, not an absolute ban on firearms. Consequently, Defendant has failed to meet the first *Pike* burden.

Moreover, the Plaintiff asserts that even if the Defendant met that burden, they have not met the second problem of demonstrating that the effects on interstate commerce are only incidental. Which effects are enormous. First, the Act denies every citizen of the Commonwealth, including Plaintiffs, of their Second Amendment rights. Second, it denies Plaintiffs the right to fully practice their occupation of selling firearms and their components. Third, the Act literally burdens commerce in at least the tens of millions of dollars owing to the recognized fact that some of the banned weapons are the most popular firearms sold in the country. *See, e.g., Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024) en banc (AR-15 rifles, banned in the Act, are the "most popular and widely owned firearm in the Nation" and approximately 28,000,000 are in circulation) (RICHARDSON, *J.*, *dissenting*). Fourth, Plaintiff has alleged, accepted as true, that the Act has had a catastrophic effect on his business and that he may be forced to go out of business.

In sum, the Plaintiffs submit that the majority of his income derives from interstate commerce. The Act has significantly impacted his business and there is a realistic threat that he may have to go out of business. The Act discriminates against commerce in that it favors one set of manufacturers and retailers over another set of manufacturers and retailers. Congress has allowed citizens throughout the country to possess the firearms banned by the Act. The Act purports to override Congress's edict. Defendant has failed to specifically show that Massachusetts has a legitimate local public interest in the enactment or enforcement of the Act. Even if they did, the harm to Plaintiff and others is clearly excessive in relation to the putative local benefits and not incidental in any stretch of the imagination.

Based on the foregoing this Court ought to hold the Act violates the Dormant Commerce Clause.

**2.     Second Amendment.**

The Act prohibits Plaintiffs from possessing the banned firearms. In Count II, Plaintiffs claim that they have a Second Amendment and Massachusetts constitutional right to possess banned firearms. That is as far as Count II goes. On the contrary, Defendant makes significant arguments in her memo concerning the *sale* of arms. But Count II does not incorporate the Plaintiffs claims relative to sales but only possession. That is, pursuant to the Act, neither Recchia nor Mass Armament have a right in Massachusetts to possess the arms banned by the Act. Such a ban is unconstitutional and that is at the gist of Count II. The claim about sales is encompassed in another Count, argued *infra*.

With respect to large capacity magazines, Plaintiffs are not going to make a separate argument at this time owing to the First Circuit's *Ocean State Tactical* decision cited by Defendant in their Memo. Of course, *Ocean State Tactical* was decided under an injunctive-relief demand posture and it is unclear how precedential it is relative to a ban on LCMs. This will more than likely become clearer when the First Circuit decides the appeal of *Capen v. Campbell*, 708 F. Supp. 3d 65, 87, 92 (D. Mass. Dec. 21, 2023) (Saylor, C.J.), *appeal pending*, 1st Cir. No. 24-1061 (*argued* Oct. 7, 2024) (denying motion to preliminarily enjoin Massachusetts's restrictions on assault weapons and large-capacity magazines prior to passage of the 2024 Act).

As to the Defendant's argument reaching the actual claim in Count II, they chiefly rely on the Fourth Circuit's decision in *Bianchi v. Brown*, 111 F.4th 438 (2024) (*en banc*) (upholding Maryland's ban on assault weapons, like the instant Act's ban). Plaintiffs, of course, disagree with that decision, but align more with the dissenting judges in that case. More in line with Plaintiffs' position on the Act's ban, at least where it concerns the popular AR-15 rifle, is Judge Sheridan's decision in *Association of New Jersey Rifle & Pistol Clubs, Inc v. Platkin*, ___ F.Supp.3d ___ (D.N.J. 2024).

Plaintiffs believe that Judge Sheridan's decision is more unemotional and truer to legal principles than is the *Bianchi* decision. In that respect, Judge Sheridan opened his decision by stating:

> It is hard to accept the Supreme Court's pronouncements that certain firearms policy choices are "off the table" when frequently, radical individuals possess and use these same firearms for evil purposes.[3] Even so, the Court's decision today is dictated by one of the most elementary legal principles within our legal system: *stare*

> *decisis.* That is, where the Supreme Court has set forth the law of our
> Nation, as a lower court, I am bound to follow it.

In the included footnote of the above quote, the judge referenced the late Justice

Scalia's statement in *District of Columbia v. Heller*, 554 U.S. 570, 636 (2008):

> We are aware of the problem of handgun violence in this country, and
> we take seriously the concerns raised by the many *amici* who believe
> that prohibition of handgun ownership is a solution. The Constitution
> leaves the District of Columbia a variety of tools for combating that
> problem, including some measures regulating handguns.... But the
> enshrinement of constitutional rights necessarily takes certain policy
> choices off the table.

In contrast, a close reading of *Bianchi* leaves one with a tangible feeling that the

majority decision was colored by emotions. *See, e.g.* Dissent would uphold a

challenge to any "conceivable weapon, no matter how dangerous"; The gun ban was

instigated by "The ripples of fear reverberating throughout our nation in the wake of

the horrific mass shootings [listing them]; "children's bodies 'stacked up … like

cordwood' on the floor of a church"; students describing classrooms "as a 'war zone'

with 'blood everywhere'; movie theaters erupting in gunfire "leaving 'bodies' strewn

and 'blood on seats, blood on the wall, blood on the emergency exit door"; "'shoes

scattered, blood in the street, bodies in the street' while bullets blazed through the

sky"; "'a pile of dead children'"; "one of those officers as he tried to count the dead

children, but 'kept getting confused,' as his 'mind would not count beyond the low

teens.'"; "central cause of this mass carnage"; and so on. The concurrence began its

discussion by endorsing the reactionary legislation at issue: "In the wake of one of

this country's most horrific mass shootings, Maryland's legislature acted"; "heeding

the pleas for action of [sic] its constituents" In fact, Judge Gregory, in his sole

concurrence, pointed out the fallacy of the majority opinion's emotional lean:

> [W]e cannot ignore the horrific tragedies the majority
> highlights in its opinion. Over the past two decades, our nation
> has in fact suffered at the hands of those who elected to inflict
> turmoil on innocent victims, communities, and our society
> overall. Unfortunately, our nation's citizens are faced with the
> fear that we, or our loved ones, may be harmed while shopping
> for groceries, enjoying outside entertainment, taking a class,
> attending a religious service, or otherwise engaging in what
> should be a safe activity. *I am sympathetic to the very troubling
> realities on which the majority sheds light. However, I believe
> that binding precedent prohibits us from considering those
> tragedies, or a legislature's interest in limiting or preventing
> them, when assessing the validity of a statute that implicates
> the Second Amendment.* (emphasis supplied)

On the other hand, Judge Richardson's dissent, speaking for four other judges, does

not rest on emotions, but simply on the constitutional rights of the Nation's citizenry.

Conversely, Judge Sheridan applied the facts and law in deciding the

constitutionality of New Jersey's gun ban. In short, the Judge followed the *Bruen*

standard as it concerned the AR-15 rifle, the one banned arm that the decision

focused on. The first step is whether the Second Amendment's plain text covers an

individual's conduct to determine if the Amendment protects it. Of course, the arms

at issue must be in "common use" and cannot be "dangerous and unusual". If this step

passes muster, then a court determines if the law in question is consistent with the

Nation's historical tradition of firearm regulation. The government bears the second-

step burden.

Judge Sheridan found that *Heller* and *Bruen* supported the right to possess

banned firearms, even though they are not pistols as in those cases. In fact, the *Platkin*

court found, as other courts have, that the named firearm is "'overwhelmingly chosen

17

by American society for [a] lawful purpose.'" (alteration in original). Turning to the next step, Judge Sheridan found that the AR-15 ban could not stand under Supreme Court precedent because it is a "commonly used firearm for self-defense … within the home." The judge noted that "in this Court's understanding of Supreme Court precedent, a categorical ban on a class of weapons commonly used for self-defense is unlawful."

The *Platkin* judge did not find the LCM ban unconstitutional, of course. Nevertheless, that is not an issue as yet given that this Circuit is considering it in a pending case. Therefore, Plaintiffs ask that a decision on the LCM decision be deferred until the Circuit acts and then it can be more intelligently briefed.

In sum, Plaintiffs respectfully request that this Court follow Judge Sheridan's reasoning rather than that applied by *Bianchi*. Supreme Court precedent indicates that the ban on the named firearms, at least the more popular ones, in the Act is unconstitutional and therefore Plaintiffs' Second Amendment rights to possess them have been infringed.

**3.    Equal Protection.**

Apparently, the Defendant has misunderstood Count III of the Complaint. Count III deals with property rights; the right to an occupation, to earn a living, and to be free from governmental interference in doing so, the same as does any citizen of the United States. Plaintiff is in a legal occupation, a firearms dealer, and has devoted many years and expenses to that occupation. Plaintiffs have an equal protection right to practice their occupation and earn a living. Defendant has failed to oppose this

right in their Motion and have not cited to any jurisprudence that is contrary to the claims in Count III.

In fact, jurisprudence is clear that governments have no, or little, right to interfere in a person's occupation—in this case, a firearms dealer.

In *Greene v. McElroy*, 360 U.S. 474, 492 (1960) the Court stated that "the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Also see, Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) (the liberty that a citizen enjoys under the Fourteenth Amendment encompasses the right "to engage in any of the common occupations of life" and it may not be interfered with "under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect") (citations omitted). In that vein, citing to a plethora of settled-law, the Supreme Court held in *Shelton v. Tucker*, 364 U.S. 479, 488 (1960) that in cases where a state attempts to require certain conditions be met before allowing a citizen to practice their profession or occupation that "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved."

Moreover, "'the right of the individual … to engage in any of the common occupations of life'" has long been recognized as being one of the guarantees under the Fourteenth Amendment as it pertains to the concept of liberty. *Board of Regents v. Roth,* 404 U.S. 564, 572 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399

(1923)). Even as far back as 1884 Mr. Justice Bradley wrote in his concurrence in

*Butchers' Union Co. v. Crescent City Co*., 111 U.S. 746, 762 that the right to practice

an occupation "is an unalienable right; it was formulated as such under the phrase

'pursuit of happiness' in the declaration of independence [sic]. … The right is a large

ingredient of the civil liberty of the citizen." Likewise, in *Smith v. Texas*, 233 U.S.

630 (1914) the Court recognized that "all men are entitled to the equal protection of

the law in their right to work for the support of themselves and families." *Id*. at 641.

> In so far as a man is deprived of the right to labor, his liberty is
> restricted, his capacity to earn wages and acquire property is lessened,
> and he is denied the protection which the law affords those who are
> permitted to work. Liberty means more than freedom from servitude,
> and the constitutional guaranty is an assurance that the citizen shall
> be protected in the right to use his powers of mind and body in any
> lawful calling.

*Id*. 636.

Even the Commonwealth of Massachusetts jurisprudence recognized this

tenet. "[T]he right to engage in any lawful occupation is an aspect of the liberty and

property interests protected by the substantive reach of the due process clause of the

Fourteenth Amendment to the United States Constitution and analogous provisions of

our State Constitution." *Welter v. Board of Registration in Medicine*, 490 Mass. 718,

724 (2022) (cites omitted), *cert. denied* 143 S.Ct. 2561.  The right to engage in any

particular business is a "property right" protected by common law and several Federal

and Commonwealth constitutional provisions. *Reeves v. Scott*, 324 Mass. 594, 598

(1949).

The Act impermissibly interferes with Plaintiffs' constitutional rights to earn a

living in his chosen occupation. For years Plaintiff's business was built upon the

buying, selling and legal transfer of firearms now banned by the Act. Defendant allowed Plaintiff to build his business dealing in the banned firearms but now wants to revoke that right without just cause and without warning. The business of dealing arms is legal in the United States. It's an honorable profession that has been recognized for centuries. The state cannot interfere in Plaintiffs' occupation "under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the state to effect". *Meyer*, *supra*. There is not a scintilla of evidence to prove that banning the firearms in the Act will eliminate or ameliorate criminals and/mentally incompetent people from committing criminal acts in the Commonwealth of Massachusetts. The Act has come into existence under the "guise of protecting the public interest" without evidence that such anticipated action will succeed. The Act is arbitrary, capricious and without reason. It causes severe pecuniary harm to Plaintiffs as well as all other commercial gun stores in the Commonwealth. Additionally, all citizens who choose to sell or transfer their firearms or buy ones that are now banned. Literally, the majority of the Commonwealth's population is affected by the Act.

The Citizens of the majority of states throughout the country can in fact legally possess or deal in the firearms banned by the Act. Massachusetts is punishing Plaintiffs and his business for being residents of the Commonwealth. Plaintiffs are not being treated equally like other states' citizens who can enjoy their full Second Amendment rights and their rights to engage in, and earn a living from, a chosen occupation. In that respect, the Act is unconstitutional.

**4.      Defendant's Affirmative Defenses**

Defendant has raised two affirmative defenses outside the four-corners of the Complaint, individual capacity qualified immunity, and an Eleventh Amendment claim. However, as previously stated, this civil action is, in reality, against the Act and its constitutionality, and not per se against the named Defendant, who enforces the Act and whose enforcement Plaintiff is attempting to stop. If the Court finds the Act unconstitutional, as Plaintiff proposes, then the Defendant is irrelevant. The simple solution to any perceived problem is to replace the Defendant with the Commonwealth of Massachusetts. That, of course, would solve the issue and moot immunity claims and a need to resolve them.

**A.      Individual Qualified Immunity.**

Defendant argues that the claims against the Governor ought to be dismissed in her individual capacity because she "is entitled to qualified immunity" since there's no allegation that "conduct by the Governor … constitutes a 'violation of a constitutional right,' let along a right that was 'clearly established at the time of the defendant's alleged violation." Memo at 15. Plaintiff is certainly not going to argue Defendant's claims to the extent argued in the Memo, chiefly because, as stated, the simple remedy would be to change the Defendant since the bottom line is the action attacks the Act, not any single official.

That said, Defendant's counsel first states that no facts in the Complaint establish "a violation of any constitutional right." Memo at 16. We have already argued that issue to the contrary *supra* and will not repeat those arguments here. Moreover, we believe the Defendant, a lawyer and former chief law enforcement officer of the Commonwealth, knew that there were serious legal problems with the

Act she had endorsed and signed into law. Many news organizations noted that the Defendant signed an "emergency preamble" to the Act so that it would immediately go into effect, "blocking opponents who appear to be on the verge of suspending the law for more than two years until voters get the final say." *Boston25News.com*, October 2, 2024. Defendant's footprints are all over the Act and her individual efforts to save it. Likewise, it is simply incredible to believe that the Defendant, a top lawyer in the Commonwealth, was unaware of the Supreme Court decisions respecting Second Amendment gun rights and the constitutional holdings in the four (4) main cases. Moreover, and despite counsel's reference to lower courts' cases upholding bans, and ignoring opposite holdings, the Defendant is well-aware that the entire constitutional issues revolving around these bans is going to be settled by the Supreme Court in the near future. In the final analysis, the Complaint alleges constitutional violations of rights that were clearly established.

**B.     Eleventh Amendment Defense.**

From what Plaintiffs discern from Defendant's Eleventh Amendment affirmative defense is that if the Governor violated Plaintiffs' constitutional rights under the Declaration of Rights, there is no remedy in Federal Court. In other words, the Fourteenth Amendment to the United States Constitution does not apply to this Defendant and she can enforce a law that abridges Plaintiff's Second Amendment and Equal Protection rights and deprive Plaintiffs of their property rights without due process of law.

Plaintiffs are not going to burden the Court with a lot of arguments on the issue of the Declaration of Rights. Defendant cites to *Ex parte Young* in their *Memo* at

p. 18. In *Mills v. State of Maine*, 118 F.3d 37 (1st Cir. 1997), the appellate court held

that there is no Eleventh Amendment immunity "in cases where prospective

declaratory or injunctive relief is sought under federal law", ruling that is the holding

of *Young*.  *Id*. 54.

That is exactly the type of relief being sought in this case to relieve Plaintiffs

from violations of their Federal constitutional rights. Plaintiffs are chiefly requesting

"declaratory judgment" and a "preliminary and/or permanent injunction" against the

Defendant and officers under her. *See Complaint, Relief,* a., b. While nominal

damages are also requested along with costs, traditional monetary damages per se

were not sought.

Eleventh Amendment immunity does not apply in this case.

## Conclusion

For any or all of the above reasons, the Motion to Dismiss the Complaint

ought to be denied.

> Respectfully submitted,
> The Plaintiffs,
> Gino Mario Recchia, III,
> individually and as     owner of
> Mass Armament, LLC, Inc.,
> By their attorney,

DATED: January 22, 2025

> */s/ Richard C. Chambers, Jr.,*
> *Esq.*
> Richard C. Chambers, Jr., Esq.
> BBO#: 651251
> Chambers Law Office
> 220 Broadway, Suite 404
> Lynnfield, MA 01940
> Office: (781) 581-2031
> Cell: (781) 363-1773
> Fax: (781) 581-8449

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq. (BBO# 651251)

DATED: January 22, 2025