## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**GINO MARIO RECCHIA, III,** individually
and as owner of MASS ARMAMENT, LLC,
INC., and **MASS ARMAMENT, LLC, INC.**

     Plaintiffs,

v.

**ANDREA JOY CAMPBELL,** in her official
capacity as Attorney General of the
Commonwealth of Massachusetts; and

**TERRENCE M. REIDY,** in his official
capacity as Secretary of the Executive Office
of Public Safety and Security of the
Commonwealth of Massachusetts,

     Defendants.

Civil No.: 1:24-cv-12560-RGS

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Pursuant to the Court's permission, Plaintiffs filed an Amended Complaint. Plaintiffs

submit that the Amended Complaint is significantly the same as the initial Complaint, except for

adding more detailed financial data pertaining to the Dormant Commerce Clause claim. The

Court, of course, tentatively dismissed without prejudice the Commerce Clause and Fourteenth

Amendment claims, subject to filing an Amended Complaint. As pointed out by Defendants'

counsel, a recent decision from the First Circuit purportedly forecloses further litigation on the

Second Amendment claims.

We address the issues raised in the *Memorandum of Law in Support of Defendants'*

*Motion to Dismiss the Amended Complaint* (hereinafter, the "Memo") in the order they have

presented them. In that respect, Plaintiffs will not repeat their previous arguments relative to the

Defendants' first Motion to Dismiss, but instead refer to, and incorporate herein, all those

arguments we presented to the Court in *Plaintiffs' Memorandum in Opposition* filed on January

22, 2025, Docket No. 12.

1.  **Defendants' Argument That There is No Second Amendment Violation.**

Most respectfully, counsel realizes that the Second Amendment issue may be considered

moot at this time because of the First Circuit's decision in *Capen v. Campbell*, 134 F.4th 660

(2025), which the Court is constrained to follow. Therefore, undersigned counsel will refrain

from fully responding to Defendants' arguments but will only point out a few related issues and

rely on Plaintiffs' previous arguments in their Opposition to the first Motion to Dismiss.

Plaintiffs respectfully submit that this issue should soon be decided by the Supreme Court, as

indicated by four (4) Justices in *Snope v. Brown*, 145 S.Ct. 1534 (June 2, 2025). *Snope* was

decided by the Fourth Circuit under the name of *Bianchi v. Brown*, 111 F.4th 438 (2024) (*en

banc*). Reading the comments on certiorari denial, in counsel's view, if the instant case travels

the appellate route up to the Supreme Court of the United States, it is highly probable that the

Supreme Court will by then be taking some action, yea or nay, on this particular case.

First, Defendants erroneously assumes that Plaintiffs are making a facial challenge to the

Act. But, in actuality, this is an as-applied challenge. At the beginning of the Amended

Complaint, Plaintiffs clearly state that the attack is centered on "'assault-type weapons' and their

magazines or ammunition feeders … as well as the duties now required of firearm retailers and

their consumers." There is no claim that the entire Act is unconstitutional. *See further, April 17,

2025 Hearing Transcript*, p. 8 (undersigned counsel responding to the Court's question that

counsel was looking to have the "entire Act stricken" that "no, just the part that applies to my

client" being prohibited from ordering and selling the firearms under his federal license and making a living, and, of course, the right to possess the firearms in the first place). Moreover, it does not matter in this Count what Plaintiffs intend to do with the banned firearms if they acquire them. The Act denies Plaintiffs the right to possess the banned firearms, just like all Massachusetts citizens. The Count deals with Plaintiffs' Second Amendment rights to possess the banned firearms, not the right to sell them. That right to sell is covered in other counts.

Second, Plaintiffs respectfully disagree with the *Capen* decision and contend that it is faulty in a substantial respect, which will be argued in further forums.

*Capen*, of course, was decided in a preliminary injunction denial appeal. The entire decision, probably most of the same type of decisions around the country dealing with bans on assault-type weapons, rest on whether the Second Amendment was ratified to ensure people could possess modern assault style weapons for self-defense. In other words, it has been assumed in most opinions that when the Second Amendment was written the sole intent of the Framers and constituents was that they be able to keep and bear arms so they could defend themselves or be ready for calls to the militia.

It is Plaintiffs' position, however, that those are just two of the reasons for the Second Amendment. The primary reason was that the early Colonists feared of being disarmed by the government and then having the government subjugate the constituency. As the prestigious Heritage Foundation posited:

> The right to keep and bear arms for self-preservation may vest in the individual, but it also secures a collective resistance against large-scale threats to liberty. The founding generation well understood that people who lack the means to defend and enforce their rights are not, in any meaningful sense, free. For centuries, ruling monarchs had often disarmed the general population and then employed professional armies or loyal "select" militias to impose their tyrannical rule on a defenseless people.

3

In a very real sense, the war for independence from Great Britain started over King George III's attempts to do the same. As colonial frustrations over repeated injuries to their rights and liberties reached a breaking point, the royal response grew progressively hostile and heavy-handed. Increasingly larger numbers of royal soldiers were sent to occupy Boston, not to protect the civilians from foreign threats, but to enforce controversial laws at bayonet-point and intimidate the colonists into submission. Ultimately, under orders from the King, General Thomas Gage led hundreds of well-armed professional troops to forcibly seize supplies of arms and gunpowder stored in some of the most disaffected areas of colonial America—the Massachusetts towns of Lexington and Concord. The ensuing skirmishes between British regulars and colonial militiamen were a final "spark" that set the Revolution ablaze. Had the colonists allowed themselves to be widely disarmed—or had they not already been one of the most widely armed civilian populations in history—the Revolution would certainly have been doomed.

It is little wonder, then, that the Founders immediately sought to safeguard the "right of the people to keep and bear arms" in their new nation. Their foresight to guarantee a well-armed citizenry continues, even today, to ensure the "security of a free state."

Heritage.org, *"The Essential Second Amendment: The Origins of the Second Amendment."* In other words, when the Second Amendment was enacted, the Framers, who just won a revolution, were more concerned with government taking their weapons for tyrannical purposes as they were for the individual right of self-defense.

Other authorities have also spoken about the historical reasons behind the Second Amendment. For example, the United States Congress records say:

Historical surveys of the Second Amendment often trace its roots, at least in part, through the English Bill of Rights of 1689. … That provision grew out of friction over the English Crown's efforts to use loyal militias to control and disarm dissidents and enhance the Crown's standing army, among other things, prior to the Glorious Revolution that supplanted King James II in favor of William and Mary.

The early American experience with militias and military authority would inform what would become the Second Amendment as well. … and standing armies of professional soldiers were viewed by some with suspicion.

***

4

Mistrust of standing armies, like the one employed by the English Crown to control the colonies, and anti-Federalist concerns with centralized military power colored the debate surrounding ratification of the federal Constitution and the need for a Bill of Rights.

***

… fears remained during the ratification debates that these provisions of the Constitution gave too much power to the federal government and were dangerous to liberty.

*https://constitution.congress.gov/browse/essay/amdt2-2/ALDE_00013262/* (cites omitted)

In the *Federalist Papers, No. 29*, Alexander Hamilton wrote:

By a curious refinement upon the spirit of republican jealousy, we are even taught to apprehend danger from the militia itself, in the hands of the federal government. It is observed that select corps may be formed, composed of the young and ardent, who may be rendered subservient to the views of arbitrary power. What plan for the regulation of the militia may be pursued by the national government, is impossible to be foreseen.

And, from the President Reagan library:

The notion of average citizens possessing their own weapons predates the Constitution. In the English Bill of Rights in 1689, Parliament allowed all Protestant English citizens to "have arms for their defence [sic] suitable to their conditions and as allowed by law." This law was later commentated on by Sir William Blackstone in his Commentaries on the Laws of England. He described the possession of weapons as an "auxiliary right," designed to support the core rights of self-defense and *resistance to oppression*, as well as the responsibility for the armed citizenry to protect their homeland.

*https://www.reaganlibrary.gov/constitutional-amendments-amendment-2-right-keep-and-bear-arms* (emphasis added). *Also see, District of Columbia v. Heller*, 554 U.S. 570, 592-593 (2008)

(explaining how tyrannies first disarm their opponents prior to suppressing them); *id*. at 598 that

"history showed that the way tyrants had eliminated a militia consisting of all the able-bodied men was not by banning the militia but simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents. This is what had occurred in England that prompted codification of the right to have arms in the English Bill of Rights."

*Id*. at 608-609 ("'One of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms, and by substituting a regular army in the stead of a resort to the militia.'" (cite omitted).

Another important factor to consider is that when the Second Amendment was passed, it was assumed that the "arms" in question were at least equal to the arms that the professional military soldiers carried. In fact, during the Revolutionary War, the American militia and subsequent Colonial Army had the same type of muskets as did the British soldiers, which the Colonial citizen soldier, i.e. "Minutemen", kept in their homes to defend against, for one thing, tyranny. If they had not had firearms that were equal (flint-lock muskets) to the British regulars, this Court would not even exist. Consequently, the Second Amendment has to encompass arms that are at least nearly equal to that which the regular military soldier carries. The courts that have made decisions relative to the banned-weapons statutes now at issue here and across the country have not given consideration to this historical fact: When the Second Amendment was ratified, the American citizen soldier was equipped with the *equal* rifle that the soldier in the best military in the world carried. Americans nowadays ought to enjoy this same right as did citizen soldiers in 1791 when the Second Amendment was ratified. *See further, April 17, 2025 Hearing Transcripts.* p. 10-11 (Court inquiring and counsel responding to the equivalency of firearms between American and British troops). That was the historical understanding when the Second Amendment came into existence.

2.    **The Portions of the Act at Issue Usurp Congress's Sole Commerce Clause Powers.**

Nearly all of the firearms now banned by the Act were able to be lawfully imported and sold by Plaintiffs prior to the Act's enactment. Plaintiffs purchased them from manufacturers and

6

dealers from outside Massachusetts. As the Amended Complaint demonstrates with actual figures from records, the overwhelming majority of Plaintiffs' income came from sales of the now-banned firearms. These firearms are not banned from possession or sales by Congress or the United States Government, only some states. *See Snope, supra, Statement of Justice Kavanaugh* ("AR-15s are legal in 41 of the 50 States" and those that ban them are "outlier[s]"). The banned firearms are part of the commerce of the United States. Congress has the power to regulate their movement in and out of the several states. Massachusetts does not have that power. Massachusetts cannot usurp Congress's Commerce Clause power. Massachusetts, however, has taken it upon themselves to get involved in the commerce of the United States by forbidding firearms manufacturers and dealers in other states from doing business in Massachusetts and thus taking over Congress' exclusive power.

With the utmost respect, counsel asks the Court to re-read his argument on the Dormant Commerce Clause contained in the *Memorandum in Opposition* filed on January 22, 2025, Docket No. 12., particularly at pages 9-14. In that respect, counsel suggests that the Commerce Clause claim in not just a highly substantial claim, the Court ought to adopt it and go no further as to the other claims, since there would be no need to litigate them further by granting relief based on the Commerce Clause issue.

In simple terms, let us take just a cursory look at what is going on in this case where it concerns interstate commerce. The Act's bans concern legal firearms that are permitted to be manufactured, sold, and possessed by eligible citizens throughout the United States. The United States Government permits these firearms to travel to every state from any other state and regulates that commerce. However, the Commonwealth of Massachusetts passed a law that restricts these firearms travelling into Massachusetts for sale or possession. In other words, they

have estopped the manufacturers and local Federal firearms dealers ("FFL") from conducting business in Massachusetts, which curtails Plaintiffs' business interests. They have passed a law that specifically affects interstate commerce. It cannot be any plainer. As jurisprudence holds, referenced *id.*, Massachusetts does not have the power to usurp the Congressional Commerce Clause power to regulate commerce amongst the states and other nations. Federal law is supreme, in this respect.

It appears that Defendants are saying the Amended Complaint's Commerce Clause claim ought to be dismissed primarily because the Court already dismissed it without prejudice in the Initial Complaint, subject to amendment. *See* Memo at 17. The Court did so, however, because it wanted the issue "more tightly framed … where I could focus in on exactly what the argument is, I think we're getting close to it now." *April 17, 2025 Hearing Transcripts*. p. 15. Plaintiffs amended the claim to show exactly what income was lost by the Commonwealth's interference in the interstate commerce Plaintiffs were involved in. The Court now has the data to show what the impact is on interstate commerce by the Act in this particular case and certainly can visualize how it affects all other FFL dealers throughout the Commonwealth.

Defendants also state in their Memo at 17 that we have not "plausibly allege[d]" that the Act "discriminate[s] against, or otherwise unconstitutionally burden[s], interstate commerce". What the Defendants are saying is that if they pass a law that bans an out-of-state manufacturer from selling in Massachusetts markets, in favor of other manufacturers, that is not discrimination and that it does not burden anyone's constitutional rights. Fortunately, as Plaintiffs demonstrated in their previous Opposition, that is not the law in this country.

Defendants also incorrectly state that Plaintiffs have not made any "claim that the Act discriminates facially, in purpose, or in effect against interstate commerce." *Id*. 18. But the Act

without question bars national manufacturers from Massachusetts' markets in favor of other manufacturers and has a great effect on those manufacturers and Plaintiffs' business. Defendants also make the conclusory statement that the "Act's local benefits are substantial, and include protecting Massachusetts' citizens from the 'growing and real threat' of mass shootings and gun violence." The Defendants' citation to *Ocean State Tactical* is not helpful because that case's speculation about statistics from other rare instances of violence fails to show how a ban would "protect[] Massachusetts' citizens" from some speculative threat of violence. Moreover, as previously pointed out by Plaintiffs in their prior Opposition, the Court ought to consider the wise observations of Judge Gregory in his sole concurrence in *Bianchi v. Brown*, 111 F.4th 438 (4th Cir. 2024 (*en banc*) concerning the intermittent acts of violence around the country:

> "I am sympathetic to the very troubling realities on which the majority sheds light. However, I believe that binding precedent prohibits us from considering those tragedies, or a legislature's interest in limiting or preventing them, when assessing the validity of a statute that implicates the Second Amendment."

It is more than obvious that the Act's ban has seriously impacted interstate commerce in Massachusetts, that it favors some manufacturers of firearms over other manufacturers (forcing people who want firearms to buy only from the manufacturers the Commonwealth approves), and that it has nearly put Plaintiffs out of business and restricted their income in a most substantial manner. Massachusetts has stepped into the arena of regulating commerce amongst the State's and nations. They do not have the power to do so. Only Congress does. Consequently, parts of the Act that interfere in this interstate commerce is in fact unconstitutional.

**3.    Fourteenth Amendment Violations.**

The Title of Count III of the Amended Complaint claims violations of "Deprivation of Civil Rights [] Equal Protection [] U.S. Const., Amends. XIV [] 42 U.S.C. § 1983".  Clearly, Plaintiffs have claimed, *inter alia*, a Fourteenth Amendment violation.

9

Plaintiffs have previously and sufficiently argued in his prior Opposition the Fourteenth Amendment claim as it concerns the Equal Protection Clause: that is, separate from his right to bear arms, he has a "right to an occupation, to earn a living, and to be free from governmental interference in doing so, the same as does any citizen of the United States." The Defendants still fail to separate this claim from the Second Amendment claim. They argue that it is a Second Amendment claim "'dressed in equal protection clothing'". Memo at 19. Nothing could be farther from the truth. This count concerns Plaintiffs' right to conduct a business and earn a living, irrespective of the product he is selling. It concerns Massachusetts enacting a law that tramples on Plaintiffs' right to conduct a legitimate business. It just so happens that this matter involves firearms, but that fact is irrelevant to the constitutional right at issue. It is the *constitutional right* at issue, not what is being sold. The equal protection issue involves the right of United States citizens in Massachusetts that are being treated differently than other United States citizens who do not reside in Massachusetts. Plaintiffs submit they have sufficiently made those arguments in their previous *Opposition* and consequently will not rehash it here, especially since the Court so ordered. *See April 17, 2025 Hearing Transcripts.* p. 15 ("You don't have to repeat the same arguments that you made actually very well in the brief [Opposition] so far.")

The Fourteenth Amendment, at issue in this case, states in Section 1:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Plaintiffs submit that not only has the Act violated their equal protection rights, it has also denied him the privileges granted by the United States Constitution of owning the banned

firearms and of conducting a legitimate business, earning a living and violated his due process right.

In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), one of the leading cases delivered by the Court concerning Second Amendment rights, the Supreme Court of the United States held that the Second Amendment right to keep and bear arms noted in *Heller* is enforceable to the states through the Due Process Clause of the Fourteenth Amendment. *Id*. 3036-3044. The majority, however, averted revisiting the Privileges and Immunities Clause of the Fourteenth Amendment as applied to the *McDonald* gun case because "state infringement" of the rights under the Fourteenth Amendment had traditionally "been analyzed under the Due Process Clause of that Amendment" and the Court declined to change that in the McDonald case. *Id*. 3030-31. In his concurrence, however, Justice Thomas thought there was a better approach to enforcing one's Second Amendment rights to the States:

> I agree with that description of the right [to keep and bear arms and that it's applicable to the States through the Fourteenth Amendment]. But I cannot agree that it is enforceable against the States through a Clause that speaks only to 'process.' Instead, the right to keep and bear arms is a privilege of American citizenship that applies to the States through the Fourteenth Amendment's Privileges and Immunities Clause.

*Id*. 3059. In that vein, Justice Thomas' powerful rationalization for his view certainly holds a lot of weight for using the Privileges and Immunities Clause in the instant case, despite the fact that the other Justices in the majority did not adopt his view, at least *then*.

However, the above decision does not mean that this Court cannot utilize the Privileges and Immunities Clause to hold that Plaintiffs have a Federal right to possess the banned firearms and that the Commonwealth enacted a law that infringed upon that right, violating the Privileges and Immunity Clause of the Fourteenth Amendment. *McDonald* does not forbid such use, it just

held that they were going to enforce the right to keep and bear arms upon the States through another Clause.

Here, Plaintiffs contend there is a Fourteenth Amendment right in this instance because the Commonwealth of Massachusetts is unlawfully enforcing the Act, an Act that infringes upon Plaintiffs' constitutional rights to possess the banned firearms, either because they are denied the equal protection given the other constituents living in other states, denial of the right to keep and bear the banned arms is a due process violation, Plaintiffs have a Privilege to keep and bear arms but the Commonwealth of Massachusetts enacted an unconstitutional law that strips away that Privilege, and/or Plaintiffs are entitled to a privileged right to earn a living in a legitimate business.

4.    __Conclusion.__

For any and all the above reasons, the Court ought to deny the Motion to Dismiss.

Respectfully submitted,
The Plaintiffs,
Gino Mario Recchia, III, individually and as
owner of Mass Armament, LLC, Inc.,
By their attorney,

DATED: July 11, 2025

_/s/ Richard C. Chambers, Jr., Esq._
Richard C. Chambers, Jr., Esq.
BBO#: 651251
Chambers Law Office
220 Broadway, Suite 404
Lynnfield, MA 01940
Office: (781) 581-2031
Cell: (781) 363-1773
Fax: (781) 581-8449
E-mail: Richard@chamberslawoffice.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent this day to those participants indicated as non-registered participants.


DATED: July 11, 2025

*/s/ Richard C. Chambers, Jr., Esq.*
Richard C. Chambers, Jr., Esq.